**FILED**
**JANUARY 14, 2025**
**In the Office of the Clerk of Court**
**WA State Court of Appeals, Division III**

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| ESTATE OF EMIL ROBERT ZLATICH, JR., by and through its personal representative, DANIELLE ZLATICH, individually and on behalf of EMIL ROBERT ZLATICH III, CHARLES BRADEN ZLATICH, BRIAN EUGENE ZLATICH, BRENT ALLEN ZLATICH, AND EMIL ROBERT ZLATICH IV, | ) ) ) ) ) ) ) ) ) | No. 39973-7-III |
| | ) | |
| Appellants, | ) ) | UNPUBLISHED OPINION |
| v. | ) ) ) | |
| ESTATE OF VICKIE KAUFMAN, through its personal representative, HEIDI ZANOTELLI; and the ESTATE OF DANIEL KAUFMAN, through its personal representative, HEIDI ZANOTELLI, | ) ) ) ) ) ) ) ) | |
| | ) | |
| Respondents. | ) | |

COONEY, J. — The Estate of Emil Zlatich, Jr. (Estate of Zlatich) appeals the trial

court's CR 12(b)(6) dismissal of its complaint against the Estate of Vickie Kaufman and

the Estate of Daniel Kaufman (collectively the "Estate of Kaufman"). The Estate of

Zlatich argues because it alleged facts sufficient to establish Vickie and Daniel Kaufman

(Kaufmans) had a duty to prevent their son, Ryan Kaufman, from harming Mr. Zlatich,

the trial court erred in dismissing its claim. For the first time on appeal, the Estate of

Zlatich also alleges other duties owed by the Kaufmans to Mr. Zlatich. We disagree with

the Estate of Zlatich and affirm dismissal of its complaint.

## BACKGROUND

The facts underlying this appeal are nothing short of horrendous.[1] Emil Zlatich,

Jr., (Mr. Zlatich) and his son and grandson, Emil Zlatich III, and Emil Zlatich IV,

respectively, resided together at Mr. Zlatich's home in Kennewick, Washington. Ryan

Kaufman[2] was the adult son of the Kaufmans and resided independently. Ryan was

Mr. Zlatich's neighbor, and his home shared a common driveway with Mr. Zlatich's

home. Ryan and Mr. Zlatich had been neighbors since approximately 2002 and "never

argu[ed] or feud[ed]." Clerk's Papers (CP) at 132.

According to Ryan's sister, Heidi Zanotelli, Ryan was diagnosed with depression

and psychosis around 2010 or 2011. Ryan suffered from "paranoid delusions" such as

---

[1] These facts are gleaned primarily from the amended complaint.

[2] Because of the shared surname, the first names of the parties are used for clarity.
No disrespect is intended.

2

believing his food was being poisoned by "the neighbors or whoever." CP at 114, 44.

Ryan's brother, Logan Kaufman, stated that Ryan "booby trapped" his front door with a

shotgun. CP at 54. Ryan also had delusions that he had a twin sister that his parents

"'sold to the government.'" CP at 114.

The Kaufmans assisted Ryan with his mortgage payments and other expenses,

helped him obtain mental health treatment, and were generally aware of Ryan's mental

health struggles. They also had keys to "a secret indoor shooting range" Ryan

maintained on his property. CP at 106.[3] Additionally, Emil III, mentioned he saw the

Kaufmans "drive to their son's property, pick him and his dog up and leave, sometimes

overnight, during the approximate 6 months prior to the rampage." CP at 114-15.

In the early morning hours of August 25, 2021, Ryan, then 43 years old, lit fire to

his home and the outbuildings on his property. Then, outfitted in full tactical gear, Ryan

entered Mr. Zlatich's home where he shot and killed Mr. Zlatich and seriously injured

Emil III, and Emil IV. Ryan set Mr. Zlatich's home on fire before leaving the property.

After leaving Mr. Zlatich's home, Ryan went to his parent's home in Kennewick,

Washington. There, he shot and killed his parents before attempting to set their home on

fire. Ryan then ignited fires at the International Brotherhood of Electrical Workers

---

[3] This fact is not alleged in the Estate of Zlatich's complaint. Rather, this fact is alleged in the "Complaint for Personal Injuries" filed by Emil III, and Emil IV, against the Kaufman's estate. CP at 102-10.

3

(IBEW) building and an IBEW training facility. He also set random brush fires by releasing flares from his moving vehicle. Ryan was killed at about 6:30 a.m. "in a firefight with police in West Richland." CP at 116.

In 2023, the Estate of Zlatich filed suit against the Estate of Kaufman through its personal representative, Danielle Zlatich. The complaint alleged the Kaufmans were aware of Ryan's mental health problems, "assumed the role of supervising decedent Ryan's medications and activities," and failed to warn Mr. Zlatich of Ryan's condition. CP at 6. The complaint therefore alleged that the Estate of Kaufman was liable to the Estate of Zlatich for negligently supervising Ryan under sections 315 and 319 of the *Restatement (Second) of Torts* (Am. L. Inst. 1965).

The Estate of Kaufman promptly filed a motion to dismiss the complaint under CR 12(b)(6). In response, the Estate of Zlatich filed a motion to amend the complaint. The trial court granted the Estate of Zlatich's motion to amend the complaint. The same day, the court granted the Estate of Kaufman's motion to dismiss.

The Estate of Zlatich timely appeals.[4]

---

[4] After filing its appeal, the Estate of Zlatich filed motions to set aside the order of dismissal and for reconsideration. It does not appear the trial court has decided either motion.

4

ANALYSIS

RESTATEMENT (SECOND) OF TORTS § 315 and § 319

The Estate of Zlatich argues the Kaufmans took charge of Ryan, and therefore had a duty to exercise reasonable care to control him under section 319 of the *Restatement*. Thus, the Estate of Zlatich argues dismissal of its claim pursuant to CR 12(b)(6) was erroneous. The Estate of Kaufman responds that the Kaufmans did not have a special relationship with Ryan sufficient to impose a "take charge" duty on them. We agree with the Estate of Kaufman.

We review a CR 12(b)(6) dismissal de novo. *Kinney v. Cook*, 159 Wn.2d 837, 842, 154 P.3d 206 (2007). "Dismissal is warranted only if the court concludes, beyond a reasonable doubt, the plaintiff cannot prove 'any set of facts which would justify recovery.'" *Id.* (quoting *Tenore v. AT&T Wireless Servs.*, 136 Wn.2d 322, 329-30, 962 P.2d 104 (1998)). "All of the facts alleged in the complaint are taken as true," and this court "may consider hypothetical facts supporting the plaintiff's claim." *FutureSelect Portfolio Mgmt., Inc. v. Tremont Grp. Holdings, Inc.*, 180 Wn.2d 954, 962, 331 P.3d 29 (2014). Thus, a complaint will survive a CR 12(b)(6) motion to dismiss if there is any set of facts that would justify recovery. *Hoffer v. State*, 110 Wn.2d 415, 421, 755 P.2d 781 (1988). However, if the plaintiff's claims remain legally insufficient, even under their proffered hypothetical facts, dismissal under CR 12(b)(6) is appropriate. *Gorman v. Garlock, Inc.*, 155 Wn.2d 198, 215, 118 P.3d 311 (2005).

The Estate of Zlatich argues the Kaufmans' alleged financial support and "caregiving role" of Ryan gave rise to a special relationship sufficient to impose on the Kaufmans a "take charge" duty to exercise reasonable care to control Ryan's behavior. Br. of Appellants at 27; RESTATEMENT § 319. The Estate of Kaufman responds that the Kaufmans did not have a special relationship with Ryan because Ryan was an adult and was not subject to a guardianship; therefore, they did not have the right or ability to control his conduct.

The *Restatement* subsection 315, which has been explicitly adopted by our Supreme Court, states:

> There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless
>
> (a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or
>
> (b) a special relation exists between the actor and the other which gives to the other a right to protection.

*Petersen v. State*, 100 Wn.2d 421, 426, 671 P.2d 230 (1983).

Our Supreme Court has also adopted the *Restatement*'s rule for "take charge" special relationships. *Taggart v. State*, 118 Wn.2d 195, 219-20, 822 P.2d 243 (1992); RESTATEMENT § 319. "One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm." RESTATEMENT § 319. "This duty arises when there is a 'definite, established and

6

continuing relationship between the defendant and the third party.'" *Bishop v. Miche*, 137 Wn.2d 518, 524, 973 P.2d 465 (1999) (quoting *Taggart*, 118 Wn.2d at 219). A custodial relationship is not required for the duty to attach. *Taggart*, 118 Wn.2d at 222-23. "[T]he take charge duty is fundamentally about control." *Binschus v. State*, 186 Wn.2d 573, 578, 380 P.3d 468 (2016).

Our Supreme Court has applied the "take charge" duty in a variety of contexts. *See, e.g.*, *Taggart*, 118 Wn.2d at 195 (parole officer/parolee); *Hertog, et rel. S.A.H. v. City of Seattle*, 138 Wn.2d 265, 979 P.2d 400 (1999) (probation officers/probationers); *Joyce v. Dep't of Corr.*, 155 Wn.2d 306, 119 P.3d 825 (2005) (community corrections officers/offenders); *see also Volk v. DeMeerLeer*, 187 Wn.2d 241, 386 P.3d 254 (2016) (duty akin to "take charge" duty found in psychiatrist/outpatient client context). However, no court in Washington has applied the "take charge" duty to parents of an adult child.

In *Taggart*, our Supreme Court held a "take charge" duty existed between parole officers and parolees where there was a "'definite, established and continuing relationship'" in which the State regulated the parolee's movements within the state, required the parolee to report to their parole officer, imposed special conditions such as prohibiting the use of alcohol, and ordered the parolee not to possess firearms. *Taggart*, 118 Wn.2d at 219-20 (quoting *Honcoop v. State*, 111 Wn.2d 182, 193, 759 P.2d 1188 (1988)). Because the parole officers enforced these requirements and had statutory

7

authority to supervise parolees, our Supreme Court concluded that parole officers had taken charge of parolees. *Id.* at 220. The *Hertog* court followed *Taggart* and concluded that a city and its probation officers had a "take charge" duty to control the probationers they oversaw. *Hertog*, 138 Wn.2d at 280.

In *Joyce*, the Supreme Court concluded a "take charge" duty applied between a community corrections officer and an offender. 155 Wn.2d at 320. This was because the offender was required to remain in King County, to obtain permission from a community corrections officer before leaving Washington or changing their residence, work for Department of Corrections approved employment, pay legal financial obligations, report to their community corrections officer, refrain from controlled substances, do community service, not possess firearms, and abide by court-imposed conditions. *Id.*

The Estate of Zlatich argues the Kaufmans took charge of Ryan by generally supervising and caring for him, including regularly picking him up and driving him away from his property, possessing keys to his house and outbuildings, and controlling his financial welfare by paying his mortgage. However, even these hypothetical facts are insufficient to impose a "take charge" duty to control Ryan on the Kaufmans. Indeed, unlike the cases discussed above, the Kaufmans did not have the right, ability, or authority to control Ryan. Ryan was not subject to a guardianship or conservatorship and, despite the Kaufmans' efforts, if any, to keep Ryan on the right path, Ryan maintained the autonomy to do as he chose.

8

Further, as articulated in the dissenting opinion, there are policy reasons that dissuade us from imposing a "take charge" duty on parents who have adult offspring with mental health infirmities. Imposing such a duty would discourage parents, who are likely most motivated and best situated to assist a child floundering with mental health issues, from having any type of relationship with their struggling children.

Additionally, the Estate of Zlatich attempts to impose a parent's duty to exercise reasonable care to control their *minor* children on parents of *adult* children. RESTATEMENT § 316. However, the Estate of Zlatich does not explain why such a duty would apply to the parents of adult children. The Estate of Zlatich simply argues, without citation to any authority, that "[t]his well-established special relationship applicable to parents of minor children applies with equal vigor to the parents of adult children with mental disabilities." Br. of Appellants at 31. When a party cites no authority supporting its argument, we can assume that counsel, after a diligent search, found none. *DeHeer v. Seattle Post-Intelligencer*, 60 Wn.2d 122, 126, 372 P.2d 193 (1962).

The Kaufmans did not have the right, ability, or authority to control Ryan. Thus, they did not have a special relationship with him sufficient to impose a duty on them to prevent Ryan from harming Mr. Zlatich. The Estate of Zlatich's claim for "negligent supervision" grounded in sections 315 and 319 of the *Restatement* was therefore properly dismissed.

9

DUTIES NOT PRESENTED TO TRIAL COURT

For the first time on appeal, the Estate of Zlatich argues the Kaufmans owed Mr.

Zlatich a duty under *Restatement* sections 281, 302B, 328E, 343, and 390. However, the

Estate of Zlatich's amended complaint does not plead a cause of action under any the

above-listed sections. The only cause of action the Estate of Zlatich pleaded is one for

"Negligent Supervision" pursuant to sections 315 and 319 of the *Restatement*, discussed

above. CP at 111-19.

Generally, if a party fails to raise an issue before the trial court, the party is

precluded from raising the issue on appeal. *Smith v. Shannon*, 100 Wn.2d 26, 37, 666

P.2d 351 (1983); RAP 2.5. Consequently, we may decline to consider an issue that was

not presented to the trial court. *Int'l Ass'n of Fire Fighters, Local 46 v. City of Everett*,

146 Wn.2d 29, 37, 42 P.3d 1265 (2002). The purpose of the rule is to afford the trial

court the ability to apply the proffered law and the opportunity to correct any error.

*Smith*, 100 Wn.2d at 37. Nevertheless, if the new issue is arguably related to issues

raised in the trial court, an appellate court may exercise its discretion to consider the new

theories. *Lunsford v. Saberhagen Holdings, Inc.*, 139 Wn. App. 334, 338, 160 P.3d 1089

(2007).

In its opening brief, the Estate of Zlatich mentions in passing that "[t]he Estate is

not limited in its argument on duty to those duty theories presented to the trial court

where CR 12(b)(6) is at issue, i.e., whether the Estate has the right to maintain an action

against the Kaufmans at all." Br. of Appellants at 17. The Estate of Zlatich cites *New Meadows Holding Company v. Washington Water Power Company*[5] and *Bennett v. Hardy*[6] for this proposition. In those cases, the court found that a narrow exception to the general rule that we will not address issues for the first time on appeal exists "'when the question raised affects the right to maintain the action.'" *Hardy*, 113 Wn.2d at 918 (quoting *Maynard Inv. Co. v. McCann*, 77 Wn.2d 616, 621, 465 P.2d 657 (1970)).

In *New Meadows*, our Supreme Court used this narrow exception where one plaintiff raised and argued the applicability of a statute in its briefing for summary judgment, but another plaintiff failed to appear to contest the summary judgment motion. 102 Wn.2d at 497. The court stated waiver would not apply to prohibit the absent plaintiff from raising the issue on appeal because the statute affected that plaintiff's right to maintain the action and because the plaintiffs had "identical interests." *Id.* at 499. The court also reasoned that the trial court was not deprived of an opportunity to rule on the applicability of the statute because the issue was adequately briefed and argued by one of the plaintiffs. *Id.* at 498-99.

However, here, the situation is inapposite. The Estate of Zlatich asserts completely new legal theories not raised below. As such, the trial court was never given

---

[5] 102 Wn.2d 495, 687 P.2d 212 (1984).

[6] 113 Wn.2d 912, 784 P.2d 1258 (1990).

the opportunity to apply the law nor to correct any potential error. Consequently, we decline to address the new theories of liability raised by the Estate of Zlatich on appeal.

ATTORNEY FEES

The Estate of Zlatich makes a passing request for costs in its reply brief. Reply Br. of Appellants at 26 ("Costs on appeal should be awarded to the Estate."). Because the Estate of Zlatich is not the prevailing party, it is not entitled to an award of attorney fees. Further, even if the Estate of Zlatich did prevail on appeal, its request lacks compliance with RAP 18.1. RAP 18.1(b) states the party requesting attorney fees and expenses "must devote a section of its opening brief to the request for the fees or expenses." The Estate of Zlatich failed to do so. Thus, the Estate of Zlatich is not entitled to its attorney fees nor costs incurred to bring this appeal.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Cooney, J.

I CONCUR:

_____
Staab, J.

12

No. 39973-7-III

LAWRENCE-BERREY, C.J. (dissenting) — In my view, the majority errs by restricting the Estate of Emil Zlatich's legal theories to those argued below. For this reason, I write separately.

*Appellate courts have discretion to permit new legal theories to be argued on appeal*

CR 12(b)(6) requires a party seeking to dismiss a lawsuit for failure to state a claim to file the motion before filing a responsive pleading. Thus, such motions are filed at the inception of lawsuits, before discovery even commences. For this reason, CR 12(b)(6) motions should be granted "only 'sparingly and with care.'" *Bravo v. Dolsen Cos.*, 125 Wn.2d 745, 750, 888 P.2d 147 (1995) (quoting *Haberman v. Wash. Pub. Power Supply Sys.*, 109 Wn.2d 107, 120, 744 P.2d 1032 (1987)).

Parties opposing CR 12(b)(6) motions may argue hypothetical facts to assist the court in establishing the conceptional backdrop. *Bravo*, 125 Wn.2d at 750; *Brown v. MacPherson's, Inc.*, 86 Wn.2d 293, 298 n.2, 545 P.2d 13 (1975). "We have held that in determining [the legal sufficiency of the claim], a court may consider a hypothetical situation asserted by the complaining party, not part of the formal record, *including facts alleged for the first time on appellate review* of a dismissal under the rule." *Bravo*, 125 Wn.2d at 750 (citing *Halvorson v. Dahl*, 89 Wn.2d 673, 675, 574 P.2d 1190 (1978)).

"Neither prejudice nor unfairness is deemed to flow from this rule, because the inquiry on a CR 12(b)(6) motion is whether any facts which would support a valid claim can be conceived." *Id.*

Permitting new hypothetical facts to be argued for the first time on review conflicts with RAP 2.5(a), which generally prohibits parties from raising arguments not raised below. Thus, as shown by the above authorities, our Supreme Court has determined that the policy against dismissing lawsuits at their inception is stronger than the policy favoring issue preservation, as embodied in RAP 2.5(a).

In *Orwick v. City of Seattle*, 103 Wn.2d 249, 255-56, 692 P.2d 793 (1984), the Supreme Court discussed whether a party appealing a CR 12(b)(6) dismissal may introduce new legal theories on appeal. The *Orwick* petitioners did not articulate any clear legal theory to the trial court, appellate court, or Supreme Court. *Id.* at 251, 254-56. Nevertheless, the *Orwick* court, exercising its discretion, reversed the trial court by considering a legal theory not articulated by the petitioners—malicious prosecution. *Id.* at 256-57. For this reason, *Orwick* stands for the proposition that appellate courts, when reviewing CR 12(b)(6) motions to dismiss, may exercise discretion when considering new legal theories. Considering all viable legal theories raised by an appellant is consistent with the notion that CR 12(b)(6) motions should be granted sparingly, so that a case with potential merit is not improvidently dismissed.

> *May parents of an adult child living separately be liable for their child's criminal acts?*

The Estate of Zlatich argues that parents of an adult child living separately may be liable for their child's criminal acts. It cites no less than 19 separate sections of the *Restatement (Second) of Torts* (AM. L. INST. 1965) and *Restatement (Third) of Torts* (AM. L. INST. 1965) to support its argument. Rather than fixating on any one particular section, I would consider the argument head on: "May parents of an adult child living separately be liable for their child's criminal acts?"

The general rule is that a person is not liable for the criminal acts of a third person. *Petersen v. State*, 100 Wn.2d 421, 426, 671 P.2d 230 (1983). The cases cited by the Estate of Zlatich as exceptions to this rule share two commonalities: (1) the defendant had a "special relationship" with the third person, which typically involved the legal right to control that person, and (2) the defendant had reason to know that the third person posed a danger to others. In essence, the legal right to control a dangerous person comes with the legal duty to exercise reasonable control.

The Estate of Zlatich fails to cite one case where a court has held parents liable for the criminal acts of their adult child living separately. This is unsurprising. Even in those situations where the parents know their child is dangerous, they have no legal right to control their adult child.

Policy reasons support this result. The law should not discourage parents from assisting their adult child when the child is facing a mental health crisis. By assisting

their child, the parents reduce the risk of harm the child poses to themselves and to others. Were we to impose liability against parents simply because they were sufficiently involved to know that that their adult child posed a danger to others, we would be discouraging the important parent-child bond that helps protect the adult child and others.

*Narrow remand*

In its opening brief, the Estate of Zlatich's final argument is that Ryan Kaufman's parents may have supplied their son with the firearms in his possession. Br. of Appellants at 44-46. If true, the new legal theory raised in that final section would defray a CR 12(b)(6) dismissal. I would remand for the narrow purpose of permitting discovery into this new theory, and perhaps the question of proximate cause, if discovery established that Ryan had deadly weapons apart from those supplied by his parents.

_____
Lawrence-Berrey, C.J.